Filed 1/17/24  In re K.J. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FOUR

| | |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | B327992 |
| Los Angeles County Department of Children and Family Services,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Kristen J.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20LJJP00775A) |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Conditionally affirmed and remanded with instructions.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother, Kristen J., appeals from an order terminating her parental rights over her daughter, K.J., under Welfare and Institutions Code section 366.26.[1]  Mother contends the juvenile court erred by denying her request for a contested hearing to consider the parental benefit exception to termination of parental rights.  We conclude the juvenile court did not abuse its discretion in finding mother made an insufficient offer of proof and denying her request.

Mother also argues the Department of Children and Family Services (Department) and the juvenile court failed to comply with the inquiry requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).  The Department agrees, as do we, that ICWA's statutory requirements were not satisfied.  Accordingly, we conditionally affirm the order and remand the matter to ensure compliance with ICWA and state law.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Detention and Petition

In September 2020, the Department received a referral alleging mother had given birth to K.J. and was displaying extensive mental health issues, including suicidal ideation and major depression.  Mother was allegedly hostile and aggressive

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

with the hospital staff and newborn.  Mother's adoptive father disclosed mother was diagnosed with "bipolar [disorder], [oppositional defiant disorder] and [attention deficit hyperactivity disorder]."  As a child, mother had been in foster care and was placed with adoptive father in 2002 when she was two years old.

K.J. remained hospitalized after her birth because she was having trouble eating and receiving treatment for an infection.  She was released from the hospital to mother in October 2020 with a safety plan.  Mother's adoptive father's female companion, however, reported two days later that mother was not following the safety plan.  She also reported mother was not consistent in giving K.J. medication to treat the infectious disease.  The Department thereafter obtained a court order for K.J.'s removal from mother due to mother's neglect of the child.

In December 2020, the Department filed a section 300 petition on K.J.'s behalf alleging in pertinent part that K.J. was at serious risk of physical harm because of mother's mental and emotional problems.  The ICWA-010(A) inquiry form attached to the petition stated that K.J. may have Indian ancestry.  The Department's detention report also noted that ICWA did or might apply, as mother indicated that there is Native American ancestry on K.J.'s biological maternal grandmother's side of the family.  However, mother also submitted a Parental Notice of Indian Status form (ICWA-020) indicating KJ was ineligible for membership in a federally recognized Indian tribe.  Nonparty father filed an ICWA-020 form denying Native American ancestry.

At the detention hearing, the juvenile court found a prima facie case for jurisdiction over K.J. and ordered her detained in shelter care with monitored visitation for mother.  Based on

mother's ICWA-020 form, the court also found there was no reason to believe ICWA applied to K.J. through mother.

At the adjudication and disposition hearing in January 2021, the juvenile court declared K.J. a dependent and sustained the petition, as amended by interlineation, under section 300, subdivision (b). The court ordered K.J. removed from mother's care, and the Department was ordered to provide family reunification services to mother. Thereafter, K.J. was placed with mother's godmother, M.T.

The disposition hearing as to father was continued. At the continued hearing, father was deemed K.J.'s biological father. Father was incarcerated. The juvenile court denied him services based on the length of his incarceration and the fact that he had reunification services with regard to another child terminated and still had not treated the underlying problems. At a later hearing, the court noted father was not claiming Native American ancestry and there was no reason to believe that ICWA applied through father.

**B.    Termination of Reunification Services**

Before the six-month review hearing, the Department reported mother was allowed to have supervised visits three days per week for four hours in M.T.'s home but mother was "inconsistent" in her visits. M.T. indicated that mother frequently missed visits and was often preoccupied during visits, "i[.]e[.,] talking on the phone, videochatting, changing [K.J.'s] outfits frequently to take photos." M.T. felt mother was "not very focused on [K.J.], but rather on showing her off to friends." At the six-month review hearing in July 2021, the juvenile court

4

found mother was in partial compliance with her case plan and ordered continued reunification services.

Mother left California in September 2021 and was residing out-of-state. She said she left because she received death threats from her late boyfriend's (not father) family and friends. In early January 2022, the Department reported mother had not visited in-person since mid-September 2021. M.T. informed the Department mother would contact M.T. through FaceTime two to three times per week and speak to K.J. for approximately 15 minutes. At the 12-month review hearing in March 2022, the juvenile court terminated reunification services based on mother's failure to make substantial progress with her case plan and scheduled a section 366.26 hearing to select and implement a permanent plan for K.J.

## C. The Department's Section 366.26 Report

Prior to the section 366.26 hearing, the Department reported mother returned to California. Regarding visitation, mother claimed she saw K.J. three times a week since K.J. was placed with M.T. and "'missed visits when [mother] was sick, had therapy, or had something that [she] had to do.'" However, M.T. told the Department, "'[Mother] doesn't come to her visits a lot. [Mother and K.J.] do [FaceTime] about twice a week. They might be on the phone a good 30 or 40 minutes. Overall, their relationship is ok. It is not like a mommy and daughter relationship, but it is ok. As long as [mother] don't try to take [K.J.] out of the house, she's straight. [K.J.] wants to be around me and my family. If I'm not going, [K.J.] won't go.'" M.T. opined that K.J. was "'not really into [mother].'"

The social worker observed a monitored visit on March 9, 2022. The social worker saw mother raise her voice and exclaim, "'I'm going to get my baby back and when I do, I am leaving back home to Washington." M.T. then told mother the visit would end if mother continued to raise her voice in K.J.'s presence. K.J. appeared to be scared of mother's behavior and was hiding behind M.T.

The social worker also observed a visit on April 6, 2022. The social worker saw mother attempt to hold K.J., but K.J. ran away from mother. K.J. ran to M.T. and asked to be held. When M.T. redirected K.J. to mother, K.J. shook her head, no. Mother then told K.J. to go to her, but K.J. hid behind M.T.

As noted in a Review of Permanent Plan report filed in August 2022, M.T. later informed the Department that between March and August 2022, mother visited 34 times but missed 35 visits. M.T. also stated mother arrived up to an hour late on several occasions. M.T. opined that K.J. was "not bonded to mother during their visits" and K.J. did not like to be around mother.

M.T. subsequently notified the Department that between September 2022 and February 2023, mother attended 21 visits with K.J. but failed to attend 35 visits. M.T. reported K.J. still did not like being around mother and continued to run away from mother to go with M.T. during visits.

In a supplemental report, the Department assessed there were "no impediments for the adoption planning[,] and adoption readiness [was] complete." M.T. was committed to adopting K.J., and the Department was in agreement with the permanent plan of adoption if and when parental rights were terminated.

**D. Mother Informs the Department of Native American Ancestry**

In February 2023, mother again reported to the Department that K.J.'s biological maternal grandmother and biological maternal great-grandmother have Native American ancestry. She told the social worker she did not know if they were registered with a tribe. Mother explained she only had contact with biological maternal grandmother three times in her life.

Mother referred the social worker to her adoptive father for more information. Mother's adoptive father reported that the biological grandmother and great-grandmother have Native American ancestry. He told the social worker he had a copy of mother's birth certificate and would send it to the social worker when he located it. He had no further information regarding the tribe or if they were registered with a tribe.

In a last minute information for the juvenile court filed in February 2023, the Department summarized a November 2000 jurisdiction report from mother's childhood dependency case. Mother's biological mother, R.B., reported that she had Indian ancestry. R.B. said her father "was part Indian," as his maternal great-grandmother was Cherokee. R.B. stated the family came from West Virginia, and the Department attempted to locate the Cherokee tribe there but was unable to find one. The dependency investigator for the case contacted the Cherokee Nation in Oklahoma and was told to call the Indian Bureau in West Virginia. "Upon doing so the [investigator] learned that the telephone directory operator could not provide a number for the Indian Bureau unless the [investigator] had a specific city." No specific city was known, and no notice was given to a tribe.

7

**E.     Section 366.26 Hearing**

The juvenile court held the section 366.26 hearing on March 8, 2023.  Mother asked for the matter to be set for a contested hearing.  The court responded by observing that mother missed "various visits," and her "visitation left much to be desired throughout" the whole reporting period.  The court then noted that "the first prong of *Caden C.*[2] speaks to consistent visitation, high quality visitation."  Mother's counsel replied, "[F]or offer of proof, mother would like to testify as to visitation and parental bond for the contested [366].26."  The juvenile court inquired further into what the offer of proof was and what mother anticipated providing to the court.  Mother's counsel responded, "[M]y notes indicate that we have further information about visits outside of the [Review of Permanent Plan] report filed in August [2022] and other visits have happened since August that the court is not aware of."  Based on mother's offer of proof, the court indicated it was denying mother's request for a contested hearing.

Father's counsel then asked to be heard and joined in the request to set the matter for a contested hearing.  Father's counsel contended that while there were "some lapses," mother had consistently visited over the past six months.  The court denied the request and proceeded with the section 366.26 hearing.

Mother's counsel argued the juvenile court should apply the parental benefit exception to adoption.  The court found by clear

---

2       *In re Caden C.* (2021) 11 Cal.5th 614 (discussing required elements of the parental benefit exception to termination of parental rights).

and convincing evidence that K.J. was adoptable and there were no legal impediments to adoption.  Further, the court determined mother did not maintain regular visitation and did not establish a bond with K.J. and that it would be detrimental to K.J. to be returned to mother.  The court concluded no exception to adoption applied and terminated parental rights.  Lastly, the court found there was no reason to know or believe that ICWA applied to K.J. through mother or father.

Mother timely appealed the order.

## DISCUSSION

**A.      The Juvenile Court Did Not Abuse its Discretion in Denying Mother's Request for a Contested Hearing**

Mother contends the juvenile court erred in denying her request for a contested hearing in her attempt to establish the parental benefit exception to adoption.  We are not persuaded.

1.      *Legal Principles*

i.      *Parental Benefit Exception*

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  The goal at the section 366.26 hearing is "'specifically . . . to select and implement a permanent plan for the child.'" (*Ibid.*)  If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1).)  Once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the statutory exceptions set forth in section

9

366.26 applies.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53; see also § 366.26, subd. (c)(1); *Caden C., supra,* 11 Cal.5th at p. 625.)

One of these is the parental benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  In order to establish this exception applies, a parent must prove three elements:  (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C., supra,* 11 Cal.5th at p. 636.)  "The burden is on the parent asserting the parental [benefit] exception to produce evidence establishing that exception."  (*In re A.G.* (2020) 58 Cal.App.5th 973, 996.)

ii.     *Offer of Proof*

"A parent has a right to due process at a section 366.26 hearing resulting in the termination of parental rights, which includes a meaningful opportunity to be heard, present evidence, and confront witnesses."  (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612 (*Grace P.*).)  But a parent's right to a contested evidentiary hearing to establish an exception under section 366.26 is not automatic.  (*In re A.G., supra,* 58 Cal.App.5th at p. 998.)  Due process does not compel a court to hold a contested hearing if it is not convinced the parent will present relevant, admissible, and probative evidence.  (*Grace P.,* at p. 612.)  "'The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s)

10

so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses.'" (*Ibid.*; see also *In re A.G.*, *supra*, 58 Cal.App.5th at p. 998 [juvenile court "may require, without violating due process, that the parent provide an offer of proof in support of the adoption exception before setting a contested hearing"].)

The parent's offer of proof "must be adequate in scope and must be specific." (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 982.) A legally sufficient offer of proof must set forth "'the actual evidence to be produced, not merely the facts or issues to be addressed and argued.'" (*Ibid.*) Further, "[t]he offer of proof must consist of "'testimony, writings, material objects, or other things presented to the senses.'" [Citation.] It may not consist of simply 'the substance of *facts* to be proved . . . , since *facts* do not constitute *evidence*.' [Citation.] The material in the offer of proof must be admissible, and it "'must be *specific* in its indication of the purpose of the testimony, the name of the witness, and the content of the answer to be elicited."'" (*Id.* at pp. 1006–1007.) In the context of the parental benefit exception, a parent's offer of proof must provide specific evidence of the first two components of the exception: regular visitation and the existence of a beneficial parent-child relationship. (*Id.* at pp. 1005–1006.) "[I]f the parent's offer of proof addresses regular visitation and the existence of a beneficial parent-child relationship, it is for the court to then weigh the importance of that relationship against the benefits of adoption." (*Id.* at p. 1005.)

We review the denial of a contested hearing following an offer of proof for abuse of discretion. (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 1003, citing *Grace P.*, *supra*, 8 Cal.App.5th at

11

p. 611.) "'An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination. [Citation.]'" (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 1003.)

###### 2. *Mother's Offer of Proof Did Not Warrant a Contested Hearing*

Mother contends the juvenile court erred by finding her offer of proof insufficient to warrant a contested hearing prior to terminating her parental rights. As an offer of proof, mother initially proffered to testify "as to visitation and parental bond." This, by itself, was insufficient because it simply identified the topics to be addressed. (See *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1124 [offer of proof may not merely identify issue to be addressed] (*Tamika T.*).) When asked for further clarification as to the offer of proof and what mother anticipated providing to the court, mother's counsel stated mother had "further information about visits outside of the [Review of Permanent Plan] report filed in August [2022]" and other visits that happened since August 2022 "the court is not aware of."

Mother's offer of proof did not identify, with any precision, the specific evidence she would present at a contested hearing. Mother did not state she would testify regarding the frequency of visitation she had with K.J., nor did mother's proffer set forth actual evidence regarding such. (*Tamika T.*, *supra*, 97 Cal.App.4th at p. 1124 [offer of proof "must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued"]; *In re A.G.*, *supra*, 58 Cal.App.5th at p. 996 ["The judge may properly reject a general or vague offer which does not indicate with precision the evidence

12

to be presented and the witnesses who are to give it"].) Mother did not identify the quantity or dates of visits that occurred outside or after August 2022 or how such visits would address regular visitation in the more than two years the case had been pending.

Similarly, mother's proffer did not include any specific evidence about the existence of a beneficial parent-child relationship. A vague reference to mother addressing a "parental bond" did not allow the juvenile court to assess whether there in fact was relevant and probative evidence to be provided. "[A] proffer identifying a witness who would testify to a close parent-child bond, without including enough specifics of the substance of that testimony to establish both that the witness has evidence to offer and that he or she is competent to so testify, would also not meet the threshold of a valid offer of proof." (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 1007.) Moreover, as to mother's assertion that the juvenile court erred in crediting the Department's evidence without allowing mother an opportunity to present evidence in response, mother did not describe any specific evidence to contradict the Department's evidence regarding visitation or mother's relationship with K.J.

Mother's reliance on *Grace P.*, *supra*, 8 Cal.App.5th 605 and *In re A.G.*, *supra*, 58 Cal.App.5th 973 is misplaced. In *Grace P.*, the juvenile court recognized that the father consistently visited and maintained contact with his three children. (*Grace P.*, *supra*, 8 Cal.App.5th at pp. 609–610, 614.) The father offered to testify that during his regular visits with the children, he talked to them about school, redirected their behavioral issues, brought food for them, played with them, and told them he loved them. (*Id.* at p. 610.) The father further stated that one of his

13

children would testify that she enjoyed the visits, that she wanted the visits to continue, and that she saw father as a parental figure. (*Ibid.*) Since the father maintained regular contact with the children, the offer of proof was probative of the other elements of the parental benefit exception and was sufficient to warrant a contested hearing. (*Id.* at pp. 613–614.)

In *In re A.G.*, there was no dispute "mother [had] maintained regular visitation with [the minor]." (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 1006.) To show the parental benefit exception applied, mother identified nine witnesses who would testify to topics including her continuous contact with the minor, her relationship with him from his birth until detention, and the activities they engaged in during visits. (*Id.* at pp. 1012–1013.) The mother also offered photographs and videotapes as evidence of the closeness of the parent-child bond. (*Id.* at p. 1013.) Thus, while the offer of proof was general in some respects, it also contained specifics. (*Id.* at p. 1014.) After the trial court denied her request for a hearing, the mother appealed. The appellate court held the mother's offer of proof had to address two components of the parental benefit exception: regular contact and a beneficial parent-child relationship. (*Ibid.*) It did not have to address the additional component of whether there was a compelling reason why termination of parental rights would be detrimental to the child. (*Ibid.*) Because the mother maintained regular contact with the minor, and it was unclear from the record whether the juvenile court improperly required her offer of proof to include evidence for all three components of the parental benefit exception, the court remanded the case for the juvenile court to further consider the legal sufficiency of the mother's proffer. (*Ibid.*)

14

Unlike in *Grace P.* and *In re A.G.*, where the parents clearly maintained regular contact with the child, mother's offer of proof, in this case, did not set forth specifics about the substance of proposed testimony by any witness. Because mother failed to state with specificity the evidence she would produce concerning regular visitation and the existence of a beneficial parent-child relationship, the court did not abuse its discretion in denying mother's request for a contested hearing. (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 1010 ["A parent's failure to set forth specific evidence, especially with a record negating the parent's regular visitation of the minor, will justify the denial of a hearing"].)

Mother also argues remand is necessary because it is unclear whether the juvenile court required an offer of proof beyond the issues of regular visitation and the existence of a beneficial parent-child relationship. However, the court's questions to mother's counsel made clear the court was seeking an offer of proof regarding regular visitation. Before requesting the offer of proof, the court expressed mother's visitation "left much to be desired" and specifically noted the first prong of *Caden C.* speaks to "consistent visitation." Mother's counsel acknowledged this and stated mother would testify as to "visitation and parental bond." There is no indication in the record to suggest that the juvenile court improperly required mother to make an offer of proof as to any matter on which she did not bear the burden of proof. (See *In re A.G.*, *supra*, 58 Cal.App.5th at pp. 1005–1006.)

## B.     ICWA Inquiry

Mother argues that the Department violated its duty of inquiry required by ICWA.  The Department concedes further inquiry is necessary and remand is appropriate in this case.  We agree.

### 1.     *Governing Law*

"ICWA was enacted to curtail 'the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement' [citation], and 'to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family' [citations]." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578 (*Dezi C.*).)  Whether ICWA applies depends on whether the child who is the subject of the custody proceeding is an Indian child.  (*In re Abbigail A.* (2016) 1 Cal.5th 83, 90.)  Both ICWA and state statutory law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); accord, § 224.1, subds. (a), (b).)

Under state law, the juvenile court and the Department have "an affirmative and continuing duty to inquire whether a child for whom a petition under [s]ection 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see also *In re Isaiah W.* (2016) 1 Cal. 5th 1, 9, 11–12.)  If the initial inquiry creates a "reason to believe" a child is an Indian child, the Department is required to "make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as

16

soon as practicable." (§ 224.2, subd. (e); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) If the further inquiry gives the Department a "'reason to know'" the child is an Indian child, then the formal notice requirements set forth in section 224.3 apply. (§§ 224.2, subd. (d), 224.3, subd. (a); *In re D.S., supra,* 46 Cal.App.5th at p. 1052.) The court may make a finding that ICWA does not apply where the Department's "'proper and adequate'" further inquiry reveals "no 'reason to know'" the child is an Indian child. (*In re D.S., supra,* 46 Cal.App.5th at p. 1050.) "We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438.)

### 2.    *Further Inquiry was Required in this Case*

While mother indicated in her ICWA-020 form that she did not have any known Native American ancestry, mother informed the social worker at least twice that K.J.'s biological maternal grandmother and biological maternal great-grandmother have Native American ancestry. Mother was formerly in foster care and only had contact with biological maternal grandmother three times in her life. Mother referred the social worker to her adoptive father for more information, who also reported that biological maternal grandmother and great-grandmother have Native American ancestry. However, neither mother nor adoptive father knew if biological maternal grandmother or great-grandmother were registered with a tribe or what tribe that would be.

Additionally, a jurisdiction report in the dependency case from mother's childhood indicated mother had Cherokee ancestry. In 2000, the Department attempted to trace mother's

17

ancestors to a Cherokee tribe in West Virginia.  In the recent dependency case concerning K.J., the record does not demonstrate any attempt to contact a Cherokee tribe or mother's biological extended family members.

The Department concedes it did not conduct a proper inquiry, as it should have contacted the Cherokee tribes and provided them with the information it had gathered regarding mother's biological relatives.  The duty of inquiry required the Department to further investigate mother's claims regarding K.J.'s possible Native American ancestry, especially as mother was a former foster child who had limited contact with her biological mother.  (§ 224.2, subd. (e).)  Furthermore, the Department concedes the matter should be remanded for further inquiry regarding the reported Cherokee heritage in mother's biological family.  We agree and remand for the Department and the juvenile court to conduct further investigation into K.J.'s possible Native American ancestry through mother.

**DISPOSITION**

The order terminating mother's parental rights is conditionally affirmed.[3] The matter is remanded with instructions to the Department and the juvenile court to conduct further ICWA inquiry as soon as practicable. If that inquiry reveals evidence of Native American heritage, then the Department and the court must comply with the additional ICWA requirements, including, if applicable, the notice requirements of section 224.3. If it does not, then the order shall stand.

MORI, J.

We concur:

COLLINS, Acting P. J.

ZUKIN, J.

---

[3] Mother asserts that conditional reversal is needed to allow the juvenile court "full jurisdiction" to ensure compliance with ICWA. However, mother does not articulate any reason why conditional affirmance would prohibit the juvenile court from having the necessary jurisdiction to ensure ICWA's requirements are satisfied.

19